376 F.3d 102
 OKEMO MOUNTAIN, INC., Plaintiff-Counter-Defendant-Appellee,
v.
UNITED STATES SPORTING CLAYS ASSOCIATION, and Bob L. Davis, Defendants-Counter-Claimants,
Patrick J. Sikorski, Defendant-Counter-Claimant-Appellant,
Overseas Services, Inc. d/b/a Expeditions, Defendant-Counter-Claimant.
 No. 03-9247.
 United States Court of Appeals, Second Circuit.
 Argued June 10, 2004.
 Decided July 16, 2004.
 
 Appeal from the United States District Court for the District of Vermont, J. Garvan Murtha, J.
 R. Bradford Fawley, Downs Rachlin Martin PLLC (Bruce C. Palmer, Downs Rachlin Martin PLLC, on the brief), Brattleboro, VT, for Defendant-Counter-Claimant-Appellant Patrick Sikorski.
 Lawrence G. Slason, Salmon & Nostrand (Richard H. Coutant, Salmon & Nostrand, on the brief), Bellows Falls, VT, for Plaintiff-Counter-Defendant-Appellee Okemo Mountain, Inc.
 Before: WALKER, Chief Judge, JACOBS, Circuit Judge, and STANCEU, Judge.*
 Judge JACOBS dissents in a separate opinion.
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Defendant-counter-claimant-appellant Patrick Sikorski ("Sikorski") appeals the judgment of the United States District Court for the District of Vermont (J. Garvan Murtha, District Judge) granting summary judgment to plaintiff-counter-defendant-appellee Okemo Mountain, Inc. ("Okemo") on Okemo's motion to renew a judgment against Sikorski from 1995 and on Sikorski's motion pursuant to Federal Rule of Civil Procedure 60(b)(5) for relief from the judgment on the basis of newly-discovered terms of a release instrument used to settle the underlying lawsuit against his co-defendant and principal, United States Sporting Clays Association ("USSCA").[1] It is stipulated that Vermont law applies to this dispute. Because Vermont law requires that ambiguous releases be interpreted by a fact-finder as a question of fact, and reasonable people could differ as to the scope of the release at issue in this case, summary judgment for Okemo as a matter of law was not appropriate. Accordingly, we VACATE and REMAND for further proceedings.
 
 
 2
 Okemo brought this action to renew a judgment that was entered against Sikorski in 1995. Okemo had originally sued, inter alios, Sikorski, USSCA, and USSCA's president, Bob Davis, for a series of tort and contract claims arising out of a failed clay shooting event. Sikorski was originally sued both in his representative capacity as an agent of USSCA and in his individual capacity. In the course of settling the lawsuit with USSCA, Okemo entered into release agreements with both Bob Davis and USSCA, who were represented by different lawyers; Sikorski represented himself in the underlying suit pro se. The instrument signed by Okemo and USSCA purported to release "officers, agents, [and] employees [of USSCA] ... of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money,..., controversies, agreements, promises, ..., damages, judgments,..., claims and demands whatsoever." After releasing USSCA and its agents, Okemo proceeded to trial against Sikorski on the claims against him in his individual capacity. A copy of the release issued to USSCA and its agents was not furnished to the district court after settlement, nor was it furnished to Sikorski until 2003, when Okemo sought to renew its judgment. Okemo concedes that the instrument released Sikorski in his capacity as an agent. At issue is whether, under Vermont law, the release can be construed to bar claims against Sikorski in his individual capacity, since the underlying judgment Okemo seeks to renew found Sikorski liable only in his individual capacity.[2]
 
 
 3
 The district court held that the instrument could not be construed as releasing Sikorski in his personal capacity, principally relying upon Horizon Financial, F.A. v. Hansen, 791 F.Supp. 1561 (N.D.Ga.1992). The district court found that Okemo's having abandoned the claims against Sikorski in his agency capacity after entering into the release was probative evidence that "strongly suggests" that the intention of the release was narrow; accordingly, the district court entered judgment for Okemo and renewed its 1995 judgment, notwithstanding the discovery of the release.
 
 
 4
 We review a district court's grant of summary judgment de novo, Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir.2003), and a district court's denial of a Rule 60(b) motion for an abuse of discretion, Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d Cir.1998). In sum, we read Vermont law to command a different result from the one reached by the district court. Vermont law plainly requires that when "the scope of the release cannot be determined from the language alone," and the "language of the document is ambiguous and must be clarified by reference to external evidence, construction becomes a question of fact [and][t]herefore summary judgment on this issue [is] error." Inv. Props., Inc. v. Lyttle, 169 Vt. 487, 498, 739 A.2d 1222 (1999) (citing Hous. Vt. v. Goldsmith & Morris, 165 Vt. 428, 430, 685 A.2d 1086 (1996)). Accordingly, here, where the language of the release is exceptionally broad but might reasonably be construed more narrowly to release agents of the principal only in their representative capacities, a trial is necessary to consider "what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of the surrounding facts and circumstances under which the parties acted." Economou v. Economou, 136 Vt. 611, 619, 399 A.2d 496 (1979).
 
 
 5
 To be sure, the threshold matter of the existence of ambiguity in the release is itself a question of law. See Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 577, 556 A.2d 81 (1988). A provision is ambiguous to the extent that reasonable people could differ as to its interpretation. Id. And the surrounding facts in this case do not resolve the ambiguity as a matter of law in either direction. On the contrary, we conclude that reasonable people could differ about the effect of the release upon Sikorski in his individual capacity for causes of action arising from the failed USSCA event for the following reasons: (1) Most importantly, the release could not have been more broadly drawn, but was silent about whether the instrument more specifically sought to release the class of agents from all related causes of action (even in their individual capacities) or whether the release sought to release agents only in their agency capacities; (2) The release included Sikorski's name because his name was in the caption of the case, but failed to mention him specifically elsewhere in the instrument; (3) USSCA must have been negotiating to benefit its agents and employees, who were ultimately released by the instrument, but it is less clear whether USSCA wanted to buy peace from every aspect of the lawsuit beyond the potential of its own liability (including the benefit of not having its employees testify at any trial); (4) Okemo did not disclose the terms of the release either to the original district court at the time it settled or to Sikorski until 2003, eight years after the release was signed and judgment was entered; and (5) Bob Davis's lawyer was not aware that Okemo proceeded to trial against Sikorski — he assumed Okemo settled with all parties through release instruments.[3] Accordingly, a trial is warranted to determine what was contemplated by the parties at the time the release was executed. See Economou, 136 Vt. at 619, 399 A.2d 496. As the Vermont Supreme Court wrote in a related context ordering a trial on the terms of a release, "it is important ... that the circumstances surrounding the execution of the release be fully explored before any decision is made about its legal effect as to ... nonsigning part[ies]." Smith v. Gainer, 153 Vt. 442, 450, 571 A.2d 70 (1990).
 
 
 6
 Finally, we note that the district court's reliance on Horizon, which held a general release not to extend to agents in their individual capacities, is misplaced. First, Horizon applied Pennsylvania law, which holds that releases are generally disfavored. Horizon, 791 F.Supp. at 1572. Second, Pennsylvania law, unlike Vermont law, holds that "the intent to release a nonparty must be stated with such particularity that it is beyond doubt.... Unequivocal language is required to release a non-signatory." Id. at 1570. Third, the release construed in Horizon was drawn more narrowly than the one before us; it expressly reserved other causes of action, so could more easily be viewed as narrow. Id. at 1569-70. Accordingly, Horizon is inapposite to the question of Vermont law implicated in this case.
 
 CONCLUSION
 
 7
 For the reasons set forth above, the judgment of the district court is hereby VACATED and REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Federal Rule of Civil Procedure 60(b)(5) enables a district court to relieve a party "from a final judgment, order, or proceeding for the following reason[ ]: ... the judgment has been satisfied, released, or discharged ..."
 
 
 [2]
 "An appeal from the denial of a motion for relief from judgment [pursuant to Rule 60(b)] raises only the question of whether that motion was properly disposed; it is not a vehicle for examining the underlying judgment itself."Cody, Inc. v. Town of Woodbury, 179 F.3d 52, 56 (2d Cir.1999).
 
 
 [3]
 It is also worth noting that both parties in this litigation believe that the release instrument is textually unambiguous; yet each reads it as warranting summary judgment in its favor. When each side reasonably thinks a textual provision unambiguously favors its position, and those positions are diametrically opposed, we feel comfortable treating that disagreement as somewhat probative of ambiguity
 JACOBS, Circuit Judge, dissenting.
 Back in 1993, Okemo filed suit in diversity "for a series of tort and contract claims arising out of a failed clay-shooting event" (to use the summary phrase used in the majority opinion), naming as defendants: United States Sporting Clays Association ("USSCA"); Bob L. Davis, who was president of USSCA; and Patrick J. Sikorski, who in the only claim now relevant was identified variously as an "agent" of USSCA, an "employee" of USSCA, and as a person acting in his own interest. In the course of litigation, USSCA paid an amount in settlement and Okemo executed a general release running in favor of USSCA as well as its agents, employees, attorneys, and so on as usual. The case went to trial against Sikorski pro se, and Okemo won a judgment that has gone uncollected (and was partially discharged in bankruptcy). In the current proceeding Okemo seeks to renew the judgment pursuant to Vt. Stat. Ann. 12 § 506, and Sikorski invokes the release (which he recently discovered).
 The district court cited the Vermont rule that a release is construed to reflect the intent of the parties as ascertained from the surrounding circumstances, Okemo Mountain, Inc. v. Sikorski, No. 1:93-cv-22 1, 4 (D.Vt. Oct. 23, 2003) (citing Economu v. Economu, 136 Vt. 611, 619, 399 A.2d 496 (1979)), and ruled that the release was not intended to discharge Sikorski in his "individual" capacity, an intent supposedly evidenced by the surrounding circumstance that Okemo pursued the claim against Sikorski to judgment post-release. Since it is undisputed that the terms of the release were unknown to Sikorski (or the court) and that USSCA did not know that Okemo continued to litigate against Sikorski, that ruling is untenable. The majority remands for further findings on the intent of the contracting parties to release Sikorski as an "individual," i.e., other than as an agent, if (as the majority erroneously supposes) the underlying judgment is predicated on acts outside the scope of Sikorski's agency.
 I respectfully dissent and would reverse because the remand draws USSCA and Davis back into litigation and thus disturbs the peace they bought eight years ago, and because the majority's approach subverts the force and effect of innumerable releases bought to settle disputes in Vermont — and perhaps elsewhere. In my view, a standard-form release of a defendant's agents and employees unambiguously releases any person who was an agent or employee of the settling defendant at least with respect to any claim arising out of the transactions and events at issue in the suit. This dissent undertakes to show: [1] that the standard-form general release at issue released agents, and that Sikorski was alleged to be USSCA's agent in the cause of action that gives rise to the judgment up for renewal; [2] that that must be enough to effect release because otherwise the standard form fails in its principal purpose of granting peace; and [3] that it is error to limit the scope of the release to agents who are selfless and unerring.
 
 
 *
 Vermont law requires that civil awards be enforced, renewed, or revived within eight years of the original judgment. Vt. Stat. Ann. 12 § 506. Having failed to collect on its judgment from 1995 through 2003, Okemo brought the underlying suit to renew pursuant to § 506. Virtually all of the 1995 judgment ($424,000) was awarded on Okemo's claim that Sikorski fraudulently induced the ski resort to enter a joint venture with USSCA concerning the failed clay-shooting event. (The other claims litigated in 1995 are irrelevant to this appeal[1]) The complaint in the original suit, which was not amended, alleged passim that Sikorski acted in tandem with USSCA and Davis as their agent in connection with his successful inducement of Okemo to participate in the clay-shooting-tournament joint venture.[2]
 Shortly before trial Okemo settled with USSCA and Davis[3] and gave them releases drafted by Davis' lawyer, Stacy Chapman, by which
 [OKEMO] remised, released, and forever discharged, and by these presents does ... remise, release and forever discharge... [USSCA] its officers, agents, employees, attorneys, successors and assigns, of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or in equity, which against the [USSCA], its officers, agents, employees, attorneys, successors and assigns, [Okemo] ever had, now has or which its officers, agents, employees, attorneys, successors and assigns has or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents.
 In words and substance, this is what is understood by lawyers and judges to be a standard-form release. As I read it, Okemo released Sikorski categorically — i.e., because he was an agent, as Okemo affirmatively alleged — from any "action" against him and any "controversy" in which he and Okemo were then embroiled. In so many words, Okemo released any "agent[ ]" of USSCA from any "suit[ ]" it "now has ... by reason of any[...]thing whatsoever."
 The majority opinion recites that this instrument "purported to release" USSCA and its agents from the tort and contract claims in the 1995 litigation, but did not entitle Sikorski to summary judgment in the underlying renewal action "because the district court found that Okemo's having abandoned the claims against Sikorski in his agency capacity after entering into the release was probative evidence that `strongly suggests' that the intention of the release was narrow" (emphasis added). Maj. Op. at 104. Thus the only circumstance relied upon to show the intent of the contracting parties was Okemo's unilateral conduct in the bench trial that commenced three weeks after the release was executed. But the question is whether Okemo could proceed to trial notwithstanding the release; and it begs the question to say that it could because it did. There is zero probative value to the subsequent trial itself as evidence of the contractual intent or understanding of USSCA, Davis, the court, or Sikorski: Mr. Chapman (the lawyer who procured the release) was unaware that Okemo went to trial against Sikorski; the judge and Sikorski were not told the terms of the release during the 1995 proceedings; and Sikorski, who was appearing pro se, cannot be expected to have intuited the likelihood that the settling defendants would have insulated their agents and employees as well. Sikorski first learned the terms of the release last year.
 II
 In Vermont (as elsewhere) a release is a contract. Economu, 136 Vt. at 619, 399 A.2d 496. Its scope "is determined by the intention of the parties as expressed in the terms of the particular instrument considered in light of all the facts and circumstances" — that is, "by a consideration of what was within the contemplation of the parties when the release was executed ..." Id.; see also Leo v. Hillman, 164 Vt. 94, 104, 665 A.2d 572 (1995). An exculpatory agreement (such as a release) is "construed strictly against the parties relying on it," but if its language is clear, "the parties `are bound by the common meaning of the words which they chose to express the content of their understanding.'" Douglass v. Skiing Standards, Inc., 142 Vt. 634, 636, 459 A.2d 97 (1983) (quoting Duke v. Duke, 140 Vt. 543, 546, 442 A.2d 460 (1982)). If a release is ambiguous (as the majority opinion holds), then resolution of the ambiguity is a question of fact to be decided on evidence of the parties' intent. Investment Props. Inc. v. Lyttle, 169 Vt. 487, 498, 739 A.2d 1222 (1999).
 The majority cites Vermont's application of these principles in Smith v. Gainer, 153 Vt. 442, 571 A.2d 70 (1990), in which a release of Smith by Gainer for damages arising out of an automobile accident was deemed ambiguous with respect to a subsequent action by Smith against Gainer for damages arising out of the same accident. Id. at 447-48, 571 A.2d 70. Smith did not address the scope of a release with respect to agents, employees, attorneys and other categories of persons discharged by a releasee; indeed, the key question on remand was whether the release granted in favor of Smith was negotiated by Gainer's insurer. Id. at 105-06, 571 A.2d 70.
 
 
 A
 closer and more useful precedent isLeo v. Hillman, 164 Vt. 94, 665 A.2d 572 (1995). In 1979 one Malinosky killed his former girlfriend and fled into hiding. Id. at 96-97, 665 A.2d 572. While he was at large, his in-state legal counsel settled tort and other claims asserted by the victim's sister, who signed a release discharging the killer of civil liability. Id. After Malinosky was apprehended, the sister as administrator of the victim's estate, asserted tort and survival claims against Dr. Donald Hillman, the psychologist who treated Malinosky prior to the murder. Id. at 97, 665 A.2d 572. The doctor's defense of release was rejected by the Vermont Supreme Court:
 There was nothing in the understanding between Malinosky's representative and [the sister] which indicated even the slightest consciousness of [the doctor's] interests.... The motivation for the release, presumably supported by adequate consideration, appears to have been strictly bilateral. There is nothing in the record to suggest that [the doctor] w[as] aware of the negotiations between Malinosky's representative and [the sister] or that they sought to protect [his] interests in connection with that settlement.
 Id. at 104, 665 A.2d 572. Thus in Hillman, though the underlying loss was the same, there was no reason to think that the parties or their lawyers had in mind a category of releasees that included Dr. Hillman. By the same token, if the release had discharged "treating psychologists," I do not think it could have been deemed ambiguous as to Dr. Hillman, nor would a hearing have been required to ascertain whether he was acting outside the scope of professional norms, or whether he was acting as a (fee-collecting) "individual" — as no doubt he was.[4] Similarly, the release here is wholly unambiguous as to any person who was in the enumerated category of USSCA agent as to any claim by Okemo arising out of the failed clay-shooting tournament.
 In considering the intention of the parties, it is critical to keep in mind that a general release is bought to secure peace as well as to settle pending or impending claims. Such peace is (at the least) freedom from the risk, trouble, and expense of litigation over the underlying events — as a defendant, indemnitor, witness, or in any other capacity. I know this because judges and lawyers know the customs and practices of the profession and need consult no expert to know the nature and intended effect of a standard form so common as a general release. See generally Marx & Co., Inc. v. Diner's Club, Inc., 550 F.2d 505, 512 (2d Cir.1977).
 The majority nevertheless holds that Sikorski may still be on the hook because he was found liable "as an individual" in 1995, and that a hearing is required to ascertain whether USSCA's release discharged Sikorski for actions taken "beyond the scope" of his authority as USSCA's agent. Putting aside (until Section III) the deficiencies in Okemo's theory of agency, the finding that Sikorski defrauded Okemo as an "individual" has no bearing on the force and effect of the release. Indeed, a general release would lose an unpredictable part of its effect if "employees" were released only insofar as the wrongful conduct was within the authorized scope of the employment or if "agents" were released only insofar as the wrongful conduct was within the authorized scope of the agency. That is because litigation could continue against employees and agents who performed badly, whether by reason of incompetence, addiction, or other incapacity, or by negligence or failure of supervision, and because the post-release litigation of these issues of authority would tend to draw the principal releasee back into the controversy. There would be the risk of indemnity for judgments, or of attorneys' fees incurred by the employee or agent; the risk of third-party claims by them; the trouble of producing documents and witnesses; attorneys' fees in connection with all these things; the time of officers and employees distracted from business; continuing risk to reputation; and so on.
 Moreover, a finding that Sikorski was pursuing individual interests would not tend to support an inference that he was no agent. Everyone in every role is an individual as well, with individual interests: thus a broker has an individual interest in his commission, and the lawyer in her fee. Even so, lawyers for parties in litigation should be able to rely upon a general release to avoid embroilment in litigation on matters arising from the underlying transactions. Unless a release categorically releases all persons classifiable as releasees (in whatever capacity) as to the underlying controversies, the buyer of the release has purchased little of value.
 This litigation is an example near to hand. USSCA no doubt assumed eight years ago that it was released from controversies over the clay-shooting tournament. On remand, however, the district court will hold a hearing on the scope of the release. USSCA may be subpoenaed to furnish documents and witnesses. Davis and perhaps other current and former USSCA employees may be required to testify or submit affidavits — not only about the release itself, but about the facts and circumstances of Okemo's contract and tort claims and Sikorski's role in them. If USSCA and Davis retain counsel to arrange compliance, costs will be incurred. Mr. Chapman, counsel to Davis eight years ago, may be called to testify, and Mr. Chapman may look to someone to compensate him for his time.
 Perhaps this expense, dislocation, and controversy could be justified if there were an open fact question; but there is none. The majority remands for fact-finding "to determine what was contemplated by the parties at the time the release was executed." Op. at 105. That sounds like a fact issue if one seeks to know whether particular parties intended at a point in time to release Sikorski from liability as an individual. But the factual development will inevitably follow another course altogether. Except insofar as explicit reservations are added to a standard-form general release (here there were none), the critical boilerplate is not subject to close negotiation between counsel or the parties; it is the product of generations of lawyers using litigation-tested terms. For example, the form at issue here releases "extents"; not one lawyer in a thousand knows what the word means, yet no competent lawyer would agree to cross it out; and no lawyer should hesitate to claim its benefit as necessary if an adversary attempted a maneuver analogous to such a writ. The only necessary intent formed by a releasee who takes a standard-form release is to buy peace — that is, a suppression of controversy touching the releasee's interest that is as thorough and complete as is customary. In this case, that would entail the end of litigation concerning the underlying controversy against anyone connected to USSCA; but it would not require a specifically formed intention as to particular acts by Sikorski or any other individual within a class of releasees. Since all this is already known and appreciated by lawyers and judges, it seems to me error to elicit fact-finding on the subject.
 III
 Even if the district court were to find on remand that the parties to the release did not intend to discharge USSCA's agents from liability for actions taken outside the scope of their agency, Okemo would not be entitled to a renewed judgment. Okemo concedes that Sikorski is discharged from any liability for acts undertaken as an agent of USSCA; it rests its argument on the 1995 finding that Sikorski acted in an "individual" capacity when he induced Okemo to enter the joint venture with the Association in 1990-91. In its brief and at oral argument, Okemo characterized that finding — noted twice in the district court's 1995 opinion — as establishing that, with respect to the claims on which he was found liable, Sikorski acted "beyond the scope of [his] agency relationship" with the USSCA.
 But Okemo seeks renewal of a judgment on its claim that Sikorski fraudulently induced Okemo to enter a joint venture with USSCA. Among other things, that inducement consisted of a meeting held December 18, 1990 at which (Okemo alleged) Sikorski acted "in [his] representative capacity" and"individually." Compl. ¶ 119. According to the district court's 1995 opinion, this (and other evidence)
 convincingly demonstrated that Sikorski, acting individually, misrepresented his experience and capabilities in the management, promotion, budgeting and financial oversight of Game Fairs and similar outdoor events. In addition, Sikorski made a specific factual representation as to [a] sponsorship commitment of $50,000.
 Okemo Mountain, Inc. v. Sikorski, No. 5: 93-CV-22 (D.Vt. May 10, 1995). But the fact that Sikorski made misrepresentations does not amount to a finding that he acted "beyond the scope of his agency." It is hornbook law that "[a] principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a[n] ... agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal." Restatement (Second) of Agency § 257 (1958). "If the statement is one which, if true, the agent would be authorized or apparently authorized to make, the principal is subject to liability for it, although deceitfully made ..." Id. cmt. a. The rule is longstanding; it means that a misrepresentation, even if unauthorized, may nonetheless be "within the scope" of an agent's authority to act on behalf of his principal. See, e.g., Hydrolevel Corp. v. American Soc. of Mechanical Engineers, Inc., 635 F.2d 118, 125 (2d Cir.1980) (citing Gleason v. Seaboard Air Line Co., 49 S.Ct. 161, 73 L.Ed. 415 (1929)).
 Okemo did not contend in 1995 that Sikorski was without authority to act on behalf of USSCA in convincing the resort to participate in the joint venture or in carrying out the Association's duties as a party to it. Nor did the district court make findings in 1995 to that effect. Okemo now claims that after settling with Davis and USSCA in 1995, it went to trial against Sikorski only on the claims made against him for actions taken outside the scope of his agency. But the heart of Okemo's case (and the 1995 judgment) was fraudulent inducement, and all of the misrepresentations relevant to that claim are alleged to have been made by USSCA and by Davis and Sikorski as agents and employees of the Association. None of Okemo's allegations pertaining to fraudulent inducement assert that Sikorski was acting on his own; he acted (misrepresentations and all) to secure a location for a 1991 clay-shooting tournament and to produce the event — which is what USSCA sought to do and was alleged to have done. See supra n. 2; see, e.g., Town of Rutland v. City of Rutland, 170 Vt. 87, 93-94, 743 A.2d 585 (1999) (rejecting defendant's claim that his lawyer, who sought and obtained approval for a public sewer, acted outside the scope of his authority).
 
 
 A
 misrepresentation made by an agent may breach the agency agreement with an honest principal, but it does not evidence or bespeak conduct "outside the scope" of the agency. Indeed, principals remain liable for misrepresentations by agents which "if true, the agent would be authorized or apparently authorized to make." Restatement (Second) of Agency § 257 cmt. a;see also Town of Rutland, 170 Vt. at 93-94, 743 A.2d 585. This applies to Sikorski's misrepresentations about sponsorship prospects and his own experience in the tournament business: would it make any sense to characterize those representations as outside the scope of Sikorski's agency if they had been true?
 In short, the district court did not find in 1995 that Sikorski acted "beyond the scope" of his agency, because (among other reasons) Okemo made no such claim in its complaint, Okemo raised no extra-agency theory of liability, and no such finding was germane to any issue presented to the district court.
 * * * * * *
 For the foregoing reasons, I respectfully dissent and would reverse the decision of the district court.
 Notes:
 
 
 [1]
 Okemo went to trial against Sikorski on claims of fraudulent inducement, double billing, and breach of a noncompete agreement. The district court ruled for Sikorski on the double-billing claim and awarded Okemo $50,000 on the contract claim. At oral argument on appeal, Sikorski's counsel stated that the $50,000 judgment was discharged in a personal bankruptcy proceeding; Okemo did not dispute that assertion
 
 
 [2]
 Okemo's complaint alleged that "[o]n December 18, 1990 representatives of USSCA met with representatives of Okemo Mountain in Ludlow, Vermont." Compl. ¶ 9. Davis and Sikorski were present when "USSCA through its agents and employees made representations to Okemo that USSCA was a nationally recognized and highly respected organization with vast experience in the sponsorship, organization, and management of Sporting Clay tournaments and outdoor expositions."Id. ¶ 10. On or about January 17, 1991, "Okemo and ... Davis, President of USSCA signed a ... Memo of Understanding for the 1991 East Coast Game Fair and USSCA Open" which "would mark the beginning of an exclusive long term relationship between the USSCA and Okemo Mountain...." Id. ¶ 11. "The USSCA agreed to be responsible for the general management, marketing and organization of the Event." Id. On February 11, 1991, "Okemo formed a Joint Venture with USSCA" through an agreement that essentially formalized the memo of understanding. Id. ¶ 12. "USSCA took primary responsibility for setting the budget... based on its representations that it had significant experience" with clay shooting tournaments. Id. ¶ 16. The joint venture agreement further provided that "USSCA shall be Event Manager of this Joint Venture and shall be responsible primarily for the organization of the Event, securing sponsorships, soliciting tournament participants, soliciting exhibitors, the marketing of the Event, and the general management of the Event including the layout and design of the tournament and exhibition" (emphasis omitted). Id. ¶ 21. "USSCA entered into a contractual relationship with ... Sikorski and retained him as its employee and/or agent to assist USSCA in carrying out the responsibilities of USSCA as Event Manager of the 1991 Game Fair." Id. ¶ 22. The tournament was a fiasco and led to Okemo's tort and contract actions against USSCA, Davis, and Sikorski.
 
 
 [3]
 The amount of the consideration Okemo received for the release is not entirely clear from the record, but its sufficiency is uncontested
 
 
 [4]
 The terms of the release are not set out in the opinion